**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DOUGLAS TURNER, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 1:13-cv-00448 (RWS) |
| vs. ) ) | |
| MAGICJACK VOCALTEC, LTD., ANDREW MACINNES, DANIEL BORISLOW, GERALD T. VENTO, and PETER J. RUSSO, ) ) ) | |
| Defendants. ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

63766845v10

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

THE SECOND AMENDED COMPLAINT'S FACTUAL ALLEGATIONS............................. 2

RELEVANT STANDARDS ................................................................................ 6

ARGUMENT ................................................................................ 7

    I.     PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCIENTER ..................................... 7

          A.    Plaintiffs Fail to Plead Adequate Facts to Establish "Motive" .............................. 8

          B.    Plaintiffs Fail to Plead Intentional or Reckless Conduct ..................................... 13

    II.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION OR MATERIAL MISSTATEMENTS................................................................................ 13

          A.    The *Copperfield Report* Cannot Satisfy Plaintiffs' Obligations .......................... 15

          B.    The Complaint Fails To Adequately Plead Falsity or Loss Causation ................. 17

    III.    THE SECTION 20(a) CLAIM MUST BE DISMISSED ............................................. 25

CONCLUSION................................................................................ 25

## TABLE OF AUTHORITIES

**Cases:**                                                                                     **Page(s)**

*380544 CANADA, INC. v. Aspen Tech.*,
    544 F.Supp.2d 199 (S.D.N.Y. 2008)........................................................................12

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2nd Cir. 1995)...................................................................................13

*In re AOL, Inc. Repurch. Litig.*,
    No. 12-CV-03497 (S.D.N.Y. Aug. 19, 2013) ........................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................6, 13

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)............................................................................ *passim*

*Avon Pension Fund v. GlaxoSmithKline PLC*,
    343 Fed. App'x 671 (2d Cir. 2009)........................................................................11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (U.S., 2007)....................................................................................8

*In re Bristol–Myers Squibb Sec. Litig.*,
    312 F.Supp.2d 549 (S.D.N.Y. 2004)........................................................................8

*In re Cisco Sys. Inc. Sec. Litig.*,
    2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ........................................................9

*In re CRM Holdings, Ltd Sec. Litig.*,
    No. 10 CIV 00976, 2012 WL 1646888 (S.D.N.Y. Mar. 4, 2013) ..........................17

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 Civ. 6478, 2003 WL 22801416 (S.D.N.Y. Nov.25, 2003) ..........................10

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................................14

*ECA v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...............................................................................7, 8

*In re eSpeed, Inc. Sec. Litig.*,
    457 F.Supp.2d 266 (S.D.N.Y. 2006)......................................................................11

63766845v10

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F.Supp.2d 432 (S.D.N.Y. 2005)................................................................10

*Greenfield v. U.S. Healthcare*,
  146 F.R.D. 118 (E.D. Pa. 1993)......................................................................16

*I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*,
  936 F.2d 759 (2d Cir. 1991)............................................................................18

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  131 S.Ct. 2296 (2011)....................................................................................14

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)............................................................................13

*LC Cap. Partners, LP v. Frontier Ins. Group, Inc.*,
  318 F.3d 148 (2d Cir.2003).............................................................................25

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)............................................................................14

*Madison Cty. Comm. Dist. v. magicJack VocalTec Ltd., et. al.*,
  No. 5:12-cv-01922 (N.D. Ala. May 18, 2012) (Ex. 20) ...............................25

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006)............................................................................25

*Matthews v. Centex Telemgmt, Inc.*,
  1994 WL 269734 (N.D.Cal. 1994) ...................................................................9

*McNamara v. Pre-Paid Legal Serv., Inc.*,
  189 Fed. App'x. 702 (10th Cir. 2006) ..............................................................9

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008)............................................................17

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ......................................................................17

*In re MRU Holdings Sec. Litig.*,
  769 F.Supp.2d 500 (S.D.N.Y. 2011)...............................................................11

*In re N. Telecom Sec. Litig.*,
  116 F.Supp.2d 446 (S.D.N.Y. 2000)...............................................................11

*In re NVIDIA Corp. Sec. Litig.*,
  2010 WL 4117561 (N.D.Cal. Oct.19, 2010)....................................................9

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2nd Cir. 2010) ............................................................17

*In re Pfizer, Inc. Sec. Litig.*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008) .................................................16

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .........................................................14, 17

*S. Cherry St., LLC v. Hennessee Grp.*,
    573 F.3d 98 (2d Cir. 2009) .............................................................8, 10

*U.S. v. Tri-State Ins. Co. of Minn.*,
    946 F.2d 581 (8th Cir. 1991) ..............................................................16

*San Leandro Emer. Med. Group Prof. Shar. Plan v. Phillip Morris Co.*,
    75 F.3d 801 (2d Cir. 1996) ............................................................10, 11

*Taachers' Ret. Sys. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ..............................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................. *passim*

*In re Tibco Software Sec. Litig.*,
    2006 WL 1469654 (N.D.Cal. May 25, 2006) .......................................9

*In re UBS AG Sec. Litig.*,
    No. 07 Civ. 11225, 2012 WL4471265 at *13 (S.D.N.Y. Sept. 28, 2012) ................................9

*In re Vivendi Univ., S.A., Sec. Litig.*,
    765 F.Supp.2d 512 (S.D.N.Y. 2011) ..................................................15

*Walker v. S.W.I.F.T. SCRL*,
    517 F.Supp.2d 801 (E.D.Va. 2007) ...................................................16

*Woodward v. Raymond James Fin., Inc.*,
    732 F.Supp.2d 425 (S.D.N.Y. 2010) ..................................................12

## Statutes, Rules and Regulations

15 U.S.C. § 78t(a) ............................................................................25

15 U.S.C. §78u-4 ...............................................................................2

15 U.S.C. § 78u–4(b)(1) ...................................................................14

Fed. R. Civ. P. 9(b) .........................................................................6, 7

iv

Fed. R. Civ. P.10b-5.................................................................................................6, 25

Fed. R. Civ. P. 11 .......................................................................................................16

v

Based on nothing more than speculative, anonymous allegations, Plaintiffs have made the implausible claim that Defendants contrived an economically irrational plan to inflate the price of shares they were purchasing themselves, by making and then correcting false statements, often on the same day.  Because the allegations do not meet the standards of common sense, much less those of the Private Securities Litigation Reform Act ("PSLRA"), Defendants magicJack VocalTec Ltd. ("magicJack" or the "Company"), Andrew MacInnes ("MacInnes"), Daniel Borislow ("Borislow"), Gerald Vento ("Vento") and Peter Russo ("Russo") submit this brief in support of their motion to dismiss the Second Amended Complaint ("Complaint").[1]

## PRELIMINARY STATEMENT

This case follows a familiar, if unfortunate, pattern.  On January 9, 2013, an anonymous author known as "Copperfield Research" posted a 45-page report ("*Copperfield Report*") (Ex. 2) on an investor website criticizing the adequacy of magicJack's public disclosures and accounting practices.[2]  Copperfield's motivation in issuing its report was transparent: it prominently stated that it had a "short position in the company . . . and stands to realize gains in the event that the price of the stock declines."  Ex. 2 at 1.

Eight days after Copperfield posted its report, Plaintiffs filed this lawsuit, which did little more than (a) cut and paste excerpts of the *Copperfield Report*, (b) assert the Individual Defendants conspired to inflate the stock price during the Class Period, and liberally apply the label "fraud."  Pls.' Compl. (Jan. 18, 2013) [Dkt. 1].  Through two amended complaints, Copperfield's error-riddled analysis remains the heart and soul of the allegations.

---

[1] The Complaint is attached to the declaration of John A. Freedman as Exhibit ("Ex.") 1.

[2] *See* Ex. 2.  On its face, the *Copperfield Report* noted that "all information contained [in the report] has been obtained from public sources" -- primarily magicJack's filings with the SEC, and (b) Copperfield's analysis was speculative and "expressions of opinion." *Report* at 1, 43-45. As discussed herein, many of Copperfield's conclusions (which Plaintiffs parrot in the Complaint) were wrong, in part, because they deliberately misread the Company's SEC filings.

This is far less than what is required to state a securities fraud claim, which requires that a plaintiff (a) plead with particularity facts that establish that defendants acted with scienter, (b) plead with particularity facts that defendants made material misrepresentations, which (c) caused plaintiffs to incur loss.  15 U.S.C. § 78u-4.  As discussed herein, the allegations regarding:

- scienter are completely illogical given that the Company was engaged in a large, well-publicized buyback of its own stock.  Plaintiffs fail to address why (a) the Defendants would inflate the stock price while they were repurchasing $100 million of Company shares, or (b) the Individual Defendants would collectively conspire to inflate the stock price, given that two of them purchased stock from a third; *see* pages 7-13

- misrepresentations are predicated on the nonsensical theory that the Company simultaneously made false and truthful disclosures, or based on Copperfield's ridiculous misreadings of the securities disclosures at issue; *see* pages 13-25; and

- loss causation are predicated on the legally implausible theory that the negative characterization of previously disclosed information caused plaintiffs to incur losses.  *Id.*

In short, the Complaint, like its source the *Copperfield Report*, is deeply flawed and should be dismissed.

## THE SECOND AMENDED COMPLAINT'S FACTUAL ALLEGATIONS[3]

Because the Court must consider the well-pled factual allegations against each defendant separately to determine whether a claim is sufficiently alleged against that defendant, we have segregated Plaintiffs' factual allegations as they relate to each defendant.

1. Allegations regarding magicJack: Plaintiffs allege that magicJack is an Israeli company that develops and sells software and hardware for making telephone calls over the

---

[3] Because the Complaint relies on partial and out-of-context statements from disclosure statements, our recitation of facts draws from the Company's public disclosure statements to the extent necessary to complete the record.  It is well established that in deciding a motion to dismiss, a Court may properly consider the full contents of disclosure statements during the class period.  *See, e.g., ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (On a 12(b)(6) motion, a court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

Internet.  Compl. ¶¶ 2, 15, 21-23.  Plaintiffs allege that between the period February 28, 2012

through January 8, 2013, the Company made a series of "false and/or misleading statements

and/or failed to disclose material facts . . . for the purpose of keeping the Company's stock price

inflated."  Compl. ¶ 3.  Oddly, the Plaintiffs' "evidence" for many of the misrepresentations are

other disclosures the Company made "on the very same page" or on the same day (or shortly

after) the purported false statement.  Compl. ¶ 118.   For example, Plaintiffs allege the following

misrepresentations that occurred at or near the same time as the corrective disclosure:

| Purported Misrepresentation | Date & Source | Plaintiffs Proof of Misrepresentation | Date of Corrective Disclosure | Alleged Market Reaction Upon Disclosure |
|---|---|---|---|---|
| "Sources of MagicJack Sales" Compl. ¶¶ 116-119 | 3/15/12 10-K, Compl. ¶ 117 | Disclosure in 3/15/12 10-K, Compl. ¶118 | 3/15/12 | None alleged |
| "Understating depreciation expense" Compl. ¶¶ 70-80 | 5/4/12 10-Q, Compl. ¶¶ 72 | Disclosure in 5/4/12 10-Q, Compl. ¶ 72 | 5/4/12 | None alleged |
| "The purchasers of Borislow's stock" Compl. ¶¶ 47-55 | 5/18/12 8-K, Compl. ¶¶ 47-48 | Disclosure in Form 4s filed 5/18/12, Compl. ¶¶ 51-52 | 5/18/12 | None alleged |
| "the Company's put option strategy" Compl. ¶¶ 101-106. | 6/4/12 8-K, Compl. ¶¶ 104-105 | Disclosures in 8/8/12 10-Q, Compl. ¶ 106 | 8/8/12 | None alleged |

The Complaint also alleges misrepresentations that reflect a misreading of the securities filings at

issue, or are conclusory, including that the Company failed to (a) disclose a lawsuit (which was

dismissed with no impact on the Company's financial position), Compl. ¶¶ 56-67, (b) record an

inventory write-down (where there are no non-conclusory allegations why it was not properly

and timely recorded), Compl. ¶¶ 81-100; (c) disclose the significance of revenue recorded from

puts (where the revenue was reported in the 10-Q each quarter), Compl. ¶¶ 107-115; and (d)

disclose that Borislow had pledged his stock (when there are no factual allegations that the stock

was pledged at the time Plaintiffs contend disclosure was required).  Compl. ¶¶ 34-46.

The Complaint also alleges that throughout the Class Period, magicJack was engaged in a large, well-publicized stock buyback program to repurchase $100 million of its stock. *See* Compl. ¶¶ 104, 106.[4]  The Company prominently disclosed the repurchase program, and noted that shares would be repurchased through "open market transactions," and "through put option contracts." *See* Ex. 10 at 31-32; Ex . 11; Ex. 12 at 30.

2. Allegations Regarding Daniel Borislow: The Plaintiffs allege that Borislow served as magicJack's CEO from the beginning of the Class period through December 2012.  Compl. ¶ 16.  Borislow is alleged to have signed the 2011 Form 10-K, and Forms 10-Q for each of the first three quarters of 2012.  Compl. ¶¶ 27-30.  Borislow is alleged to have pledged "over one million of his shares of magicJack as collateral against 'personal debt,'" Compl. ¶ 34, which he was alleged to have sold to "long term and strategic investors, including the Company's Chairman, President and three shareholders," at a price which represented a "$3.7 million discount from then-current market prices."  Compl. ¶¶ 42, 145.  Concealment of material adverse information about the Company would have increased the price these purchasers would have had to pay Borislow.  The Plaintiffs allege that on December 28, 2012, Borislow filed a Form 13G disclosing that he had released 241,028 shares that a third party had pledged to him "that served as security for a loan [he made] to unaffiliated third parties."  Compl. ¶ 45.[5]

---

[4] *See also* July 26, 2010 Form 6-K (Ex. 3) (announcing stock repurchase program); Jan. 20, 2012 Form 8-K (Ex. 4) (repurchase program increased to $55M);  Apr. 23, 2012 Form 8-K (Ex. 5) (share count reduced to 20.57M shares); Apr. 27, 2012 Form 8-K (Ex. 6) (when it completed the current $55M buyback, Company would begin a new $20M plan); June 22, 2012 Form 8-K (Ex. 7) ($20M plan  has begin); July 10, 2012 Form 8-K (Ex. 8) (share count reduction to 19.4M); Dec. 28, 2012 Form 8-K (Ex. 9) (expected to end the year with approximately 18.8M shares.); Ex. 12 at 30 (updating status of buyback program).

[5] The Plaintiffs also allege Borislow was the beneficiary of a program disclosed in the July 23, 2012 proxy statement that would be award him 50,000 shares for each dollar of earnings per share reported starting at year end 2012, although the Complaint (a) does not allege Borislow was awarded any shares, and (b) notes that Borislow resigned from the Company in December 2012, and accordingly left before he was eligible for such an award.  Compl. ¶ 147.

3.  <u>Allegations Regarding Andrew MacInnes</u>:  Plaintiffs allege that MacInnes was President between just before the start of the Class Period ("February 2012") until December 2012.  Compl. ¶ 17.  According to the Complaint, MacInnes is alleged to have purchased some of the stock Borislow sold on May 18, 2012.  Compl. ¶ 52.  MacInnes is not alleged to have sold any of his stock, nor are there other allegations about him in the Complaint.

4.  <u>Allegations Regarding Gerald Vento</u>:  Plaintiffs allege that Vento was President and CEO for the last seven days of the Class Period (between January 1 and January 8, 2013), and previously was Chairman of the Board of Directors starting in April 2012, one month after the Class Period started.  Compl. ¶ 18.  Three months after the end of the Class Period, Vento is alleged to have signed the 2012 Form 10-K.  Compl. ¶ 31.  According to the Complaint, Vento is alleged to have purchased some of the stock Borislow sold on May 18, 2012.  Compl. ¶ 53.  Any suppression of material adverse information about the Company would presumably have increased the price Vento had to pay for these shares.  Vento is not alleged to have sold any of his stock, nor are there other allegations about him in the Complaint.

5.  <u>Allegations Regarding Peter Russo</u>:  Plaintiffs allege that Russo was CFO "at all relevant times."  Compl. ¶ 19.  Russo is alleged to have signed the 2011 and 2012 Form 10-Ks, and Forms 10-Q for each of the first three quarters of 2012.  Compl. ¶¶ 27-31.  Russo is also alleged to have signed the May 18, 2012 8-K disclosing Borislow's stock sale to, *inter alia*, MacInnes and Vento.  Compl. ¶ 54.  Russo is not alleged to have sold any of his stock, nor are there other allegations about him in the Complaint.

6.  <u>Procedural History</u>: Plaintiffs allege that on January 9, 2013, Copperfield Research posted the *Copperfield Report*.  Compl. ¶ 121.  The Report asserted that a number of the Company's securities filings were inaccurate, including each of the purported misrepresentations

identified in the Complaint, and contained 125 citations to the Company's previously filed disclosures and other public information. Ex. 2 at 43-45. Plaintiffs claim that in response to the *Copperfield Report*, magicJack's stock price fell $2.01 per share or 11.6%. Compl. ¶ 128.

Eight days later, Plaintiffs filed this lawsuit, which did little more than quote extensively from the *Copperfield Report*. Pls.' Compl. (Jan. 18, 2013) [Dkt. 1]. On March 12, 2013, Plaintiffs filed a First Amended Complaint, which again, did little more than cut and paste from the *Copperfield Report*. Pls.' First Amd. Compl., (Mar. 12, 2013) [Dkt. 3]. The Second Amended Complaint was filed on July 22, 2013; while this iteration of the Complaint continues to rely extensively on the bald assertions and suppositions of the *Copperfield Report*, it takes the purely cosmetic step of actually quoting selected excerpts of language from the underlying securities filings cited in the *Copperfield Report*, rather than quoting the *Copperfield Report* directly.

## RELEVANT STANDARDS

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).[6] Moreover, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. . . conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

To state a claim under Section 10(b) and Rule 10b-5, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105. In

---

[6] Internal quotations omitted except where otherwise noted.

addition, "[s]ecurities fraud claims are subject to heightened pleading requirements [under Rule 9(b) and the PSLRA] that the plaintiff must meet to survive a motion to dismiss." *Id.* at 99.  A complaint must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud…be stated with particularity." Fed. R. Civ. P. 9(b).  "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI,* 493 F.3d at 99.  The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007).  With regard to scienter, the PSLRA specifies that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 314.  Under Second Circuit law, a plaintiff can plead scienter under the PSLRA by "alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009).

## ARGUMENT

### I.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCIENTER

The Complaint is devoid of facts sufficient to raise an inference that the Defendants, collectively or individually, acted with scienter meaning "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 319.  As set forth in the Complaint, during the Class Period, (a) magicJack was engaged in a massive, $100 million stock buyback, (b) three Individual Defendants (Vento, Russo, and MacInnes) sold no stock, (c) the fourth Individual Defendant (Borislow) sold a small portion of his holdings on one occasion during the Class Period at prices well below the Class Period peak to, *inter alia*, two other Individual

Defendants (Vento and MacInnes).   All of this raises the fundamental question: what possible motivation would the Defendants have, collectively or individually, to artificially inflate the price of magicJack stock?  The answer is clear: none.

Simply stated, the Complaint fails to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S at 570.  In evaluating the sufficiency of the scienter allegations, this Court must look at the complaint as a whole and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323.  It is not sufficient to "allege[] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *Id.* at 324. Rather, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

### A.      Plaintiffs Fail to Plead Adequate Facts to Establish "Motive"

In order to adequately plead that Defendants had "motive and opportunity" to commit fraud, a plaintiff must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198.  Executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent.  *In re Bristol–Myers Squibb Sec. Litig.,* 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).  Similarly, motives possessed by virtually all companies or corporate officers, such as the desire to keep stock prices high to avoid triggering liabilities or to increase executive compensation, are not a sufficient basis for scienter.  *S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 109-10 (2d Cir. 2009).  And this assessment is subject to the overall constraint that the facts alleged must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314.  The following discusses each of the relevant facts concerning "motive" as alleged in the Complaint; considered as a whole, they fall far short of the standard.

1. *The Company's $100 Million Stock Buyback*:  The Complaint references that, prior to and throughout the entirety of the Class Period, magicJack had committed to and was engaged in a large, well-publicized stock buyback program.  Compl. ¶¶ 104, 106.  During this time, the Company repurchased almost $100 million of its shares, representing 6,143,731 shares or over 23% of its shares outstanding.[7]

Under *Tellabs*, this Court must "take into account plausible opposing inferences" when evaluating allegations of scienter.  *Tellabs*, 551 U.S. at 323.  The Complaint, however, fails to explain why magicJack (or any other company) would artificially inflate its stock price when it was repurchasing a huge amount of its own shares on the open market -- essentially wasting its own cash.  Such an economically irrational theory makes no sense.

As multiple courts have recognized, the most compelling and cogent inference when a company is engaged in a buyback of the size and scope of magicJack's is that the Company did ***not*** act with scienter because a "strategy of repurchasing stock at a knowingly inflated price would be economically irrational." *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL4471265, at *13 (S.D.N.Y. Sept. 28, 2012).[8]

The Complaint provides no hint as to why the Defendants would have engaged in economically irrational conduct.  Under *Tellabs*, this is fatal to Plaintiffs' legal theory.

2. *The Company's Use of Puts to Effectuate the Buyback*:   Parroting Copperfield, Plaintiffs contend that magicJack's strategy of selling put options on its own stock "provided Defendants with a strong motivation to artificially inflate magicJack's stock price" because "[i]f

---

[7] *See* disclosures discussed at note [4].

[8] *See also McNamara v. Pre-Paid Legal Services, Inc.*, 189 Fed. App'x. 702 (10th Cir. 2006) (same); *In re Cisco Systems Inc. Sec. Litig.*,2013 WL 1402788 at *8 (N.D. Cal. Mar. 29, 2013) (same); *In re NVIDIA Corp. Sec. Litig*., 2010 WL 4117561, * 11 (N.D.Cal. Oct.19, 2010) (same); *In re Tibco Software Sec. Litig*., 2006 WL 1469654, *21 (N.D.Cal. May 25, 2006) (same); *Matthews v. Centex Telemgmt, Inc*., 1994 WL 269734, at *8 (N.D.Cal. 1994) (same).

9

the stock price declined too far, then the Company would lose money on its puts." *Compare* Compl. ¶ 133-144 *with Copperfield Report* at 23.  The Complaint, however, fails to allege facts that support the Plaintiffs' conclusory assertion that the put strategy was a speculative effort "to [d]istort [t]he [c]ompany's [e]arnings [p]ower."  Compl. ¶¶ 100-102.  Moreover, the assertion is based on Plaintiffs' selective and misleading reading of the Company's Class Period disclosures concerning the purpose of the put program, which by any rational and non-cherry picked reading, make clear was to effectuate the stock buyback by locking-in advantageous and certain pricing. *See* Ex. 13 at 27 ("We have sold common equity put option contracts in connection with our share repurchase program in order to lower the average share price paid for ordinary shares we purchase[]…"); Ex. 11 (the Company "used sales of puts and purchases of calls to reduce the cost of some share repurchases…[t]he put/call strategy used by the Company is the same cash outlay for repurchases regardless of moves in the stock price as the puts guarantee the Company can lock-in a repurchase price if put the stock").  *See also* Compl. ¶ 143 (acknowledging the puts were for magicJack "to purchase its own shares").  Again, the Complaint fails to explain how a strategy to repurchase stock is consistent with an incentive to artificially inflate the stock price.

Moreover, on its face, the allegation that the Company had an incentive to keep its stock price high to reduce put expenses amounts to nothing more than the type of generic corporate motive to keep the stock price high that has consistently been rejected by the Second Circuit because virtually every company has expenses that are linked to its stock price.[9]  Thus, even if the Plaintiffs had alleged a factual basis for their conclusory assertion that magicJack issued puts to speculate in its own stock -- such an allegation would not support an inference of scienter.

_____

[9] *See, e.g., S. Cherry*, 573 F.3d at 109; *In re. GeoPharma, Inc. Sec. Litig.*, 399 F.Supp.2d 432, 450 (S.D.N.Y. 2005); *San Leandro Emer. Med. Group Prof. Shar. Plan v. Phillip Morris Co.*, 75 F.3d 801, 814 (2d Cir. 1996); *In re Duane Reade Inc. Sec. Litig.,* No. 02 Civ. 6478, 2003 WL 22801416, at *8-9 (S.D.N.Y. Nov.25, 2003)

10

3. *The Lack of Stock Sales and Stock Purchases of the Individual Defendants*:  Nowhere does the Complaint allege that Vento, Russo, or MacInnes sold a single share of magicJack stock during the Class Period.  As numerous courts have recognized, that three of the four individual Defendants, all high-ranking executives at the Company, did not sell stock during the Class Period rebuts any claim of scienter.  *See, e.g., In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 289 (S.D.N.Y. 2006) (lack of stock sales tends to negate inference of scienter); *In re N. Telecom Sec. Litig.*, 116 F.Supp.2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders . . . is inconsistent with an intent to defraud shareholders.").  As the Second Circuit has recognized, the failure to allege stock sales by defendants warrants dismissal for failure to adequately plead scienter, even where another defendant did sell stock.  *See San Leandro*, 75 F.3d at 814 (the failure of some defendants to sell stock during class period undermined the plaintiffs' allegations that any defendant intended to inflate stock for personal profit).  Under *Tellabs*, this is a separate fatal flaw with Plaintiffs' legal theory.

Moreover, Vento and MacInnes ***purchased*** stock during the Class Period.  Compl. ¶¶ 42, 48, 51, 52.  As numerous courts have concluded, such purchases rebut an inference of scienter.  *See, e.g., Avon Pension Fund v. GlaxoSmithKline PLC*, 343 Fed. App'x 671, 673-74 (2d Cir. 2009); *In re MRU Holdings Sec. Litig.*, 769 F.Supp.2d 500, 519 (S.D.N.Y. 2011).

4. *The Private Stock Sale by Borislow To, Inter Alia, The Other Individual Defendants*:  Although Plaintiffs suggest that Borislow's sale of stock in May 2012 is evidence of his scienter, *see* Compl. ¶ 145, elsewhere the Complaint acknowledges that two of the buyers were Defendants Vento and MacInnes.  *See* Compl. ¶¶ 48, 51, 52, 145.  The Complaint fails to address why MacInnes and Vento would have purchased Borislow's shares if, as the Plaintiffs allege, the Individual Defendants were conspiring to artificially inflate the Company's stock price.

11

Plaintiffs' theory -- that the Defendants conspired to inflate the stock price so that one Defendant could sell stock to two other Defendants at an inflated price -- is nonsensical.  Under *Tellabs*, the only rational inference is that the Defendants did not act with scienter.

Further, Borislow's sale of stock during the Class Period fails to raise a strong inference (or even weak suggestion) of scienter because his stock sales were neither unusual or suspicious in timing.[10]  Notably, Borislow's sale was intended to provide him with liquidity, Ex. 14, was relatively small given that he owned 25% of magicJack's shares, Ex. 10 at 92, and was well below (approximately 50%) of the Class Period high of $27 per share, Ex. 12 at 29.  Courts have noted that stock sales under these circumstances do not support an inference of scienter.  *See, e.g., Woodward v. Raymond James Fin., Inc.,* 732 F.Supp.2d 425, 438 (S.D.N.Y. 2010); *380544 CANADA, INC. v. Aspen Tech.*, 544 F.Supp.2d 199, 221 (S.D.N.Y. 2008).  Moreover, for this allegation to make sense, Borislow had to believe that the price of the Company's shares were inflated; if that is what he thought, however, then it would have been completely irrational for him, as owner of 25% of magicJack's stock, to support the Company's share buyback.

5. *Borislow's Compensation Package*:  Finally, Plaintiffs assert that a compensation incentive Borislow was awarded in July 2012 that purportedly would award him additional shares if the company met certain annual earnings per share ("EPS") benchmarks "creat[ed] the personal motivation for Borislow to keep the earnings per share of the Company as high as possible."  Compl. ¶¶ 146-47.  As an initial matter, Plaintiffs do not allege (nor, given Borislow's resignation before the incentive vested, *see* Compl. ¶ 16, could Plaintiffs allege) that Borislow ever received any compensation pursuant to this incentive.  That omission renders their claim

---

[10] *See, e.g., In re Gildan Activewear, Inc. Sec. Litig.,* 636 F.Supp.2d 261, 270 (S.D.N.Y.2009) (insider stock sales must be "unusual" or "suspicious" in order to establish motive); *Glaser v. The9 Ltd.*, 772 F.Supp.2d 573, 587 (S.D.N.Y. 2011) (whether sales are "unusual" or "suspicious" depends on the percentage of holdings sold and the number of defendants selling)

insufficient under the PSLRA.  *ATSI,* 493 F.3d at 99.  Further, as the Second Circuit has long

recognized, "executive compensation dependent upon stock value does not give rise to a strong

inference of scienter" because "[i]f scienter could be pleaded on that basis alone, virtually every

company in the United States that experiences a downturn in stock price could be forced to

defend securities fraud actions."  *Acito v. IMCERA Gr., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

**B.      Plaintiffs Fail to Plead Intentional or Reckless Conduct**

The Complaint contains two, entirely conclusory paragraphs alleging that Defendants

"had actual knowledge" of three alleged misleading statements.  Compl. ¶¶ 130, 131.  These

conclusory allegations fall far short of what is required by the PSLRA, which requires more

particularity in alleging conscious conduct.  *See, e.g., Kalnit v. Eichler*, 264 F.3d 13, 142 (2d Cir.

2001) ("the strength of the circumstantial allegations must be correspondingly greater.").  The

Second Circuit has held that, in order to adequately plead intentional or reckless conduct, a

plaintiff must plead facts showing defendant's conduct to be "highly unreasonable and which

represents an extreme departure from the standards of ordinary care."  *Id.*  The two cursory

paragraphs contained in the Complaint do no more than state legal conclusions.  They do not

meet this standard.  *See Iqbal,* 556 U.S. at 678 ("mere conclusory statements, do not suffice").

**II.      PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION OR
MATERIAL MISSTATEMENTS**

Plaintiffs' allegations regarding the purported misrepresentations also fall far short of the

requisite specificity for three distinct reasons.  First, the Complaint fails to "specify each

statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all facts on which that belief is formed." 15

U.S.C. § 78u–4(b)(1)(B).  As the Second Circuit has repeatedly stated, plaintiffs "must do more

13

than say that the statements…were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir. 2004); *accord ATSI,* 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). As discussed below, Plaintiffs' allegations regarding the purported falsity of the specified statements are (a) all based on highly contorted or decontextualized misreadings of the disclosure language at issue, which (b) make no sense in light of other disclosures during the Class Period, several of which are contemporaneous, and at least one of which is found in the very same document the Plaintiffs contend is misleading. This is insufficient under the PSLRA.

Second, for each statement, Plaintiffs fail to sufficiently allege that one of the Individual Defendants actually made the material misstatement. To plead a claim against individual defendants under Section 10(b), a plaintiff must allege that a particular defendant made the misstatements. *Janus Capital Grp., Inc. v. First Derivative Traders,* 131 S. Ct. 2296, 2301 (2011). This alone warrants dismissal of the Individual Defendants from the case.

Third, for each of these statements, the Complaint fails to adequately plead loss causation, meaning that that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered…i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch,* 396 F.3d 161, 173 (2d Cir. 2005). *See generally Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005). Loss causation is typically shown by the reaction of the market to truthful information that reveals a prior misleading statement. *In re Vivendi Universal, S.A., Sec. Litig.,* 765 F.Supp.2d 512, 555 (S.D.N.Y. 2011). Here, however, the Complaint also alleges that the market reaction followed the release of the *Copperfield Report*, Compl. ¶¶ 121-128, which acknowledges that "all information contained [in the report] has been obtained from public

14

sources"; as such, as a matter of law, the *Copperfield* cannot be the basis to establish loss causation. *See, e.g., Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory…is that these facts had already been disclosed in public filings, so their [subsequent] revelation…could not have caused [the] stock price to decline.")

A.     **The *Copperfield Report* Cannot Satisfy Plaintiffs' Obligations**

Plaintiffs' two prior iterations of its complaint consisted of little more than (a) extensive quotations taken directly from the *Copperfield Report*, and (b) an assertion that when the report was released, magicJack's stock price fell. *See* Compl. (Jan. 18, 2013) [Dkt. 1]; First Amd. Compl. (Mar. 12, 2013) [Dkt. 3]. Perhaps recognizing that this did not come close to satisfying their obligations under the PSLRA, the current Complaint takes the additional cosmetic step of actually quoting language from the underlying securities filings cited in the *Copperfield Report*, rather than quoting the *Copperfield Report* directly. But the Complaint remains inextricably intertwined with the *Copperfield Report*. Indeed:

- the Complaint contains no allegations of false statements beyond those cited in the *Copperfield Report*; *Compare* Compl. ¶¶ 68-80 *with Copperfield Report* at 19-20 (change in depreciation); Compl. ¶¶ 56-67 *with Copperfield Report* at 25-26 (Madison County lawsuit); Compl. ¶¶ 47-55 *with Copperfield Report*, at 26-30 (May 18, 2012 8-K).

- the documents cited in the Complaint as purported evidence of the falsity of statements are the exact same documents that are cited in the *Copperfield Report*'s footnotes; *Compare Compare* Compl. ¶ 47-48 *with Copperfield Report*, n. 76 (citation to May 18, 2012 8-K); Compl. ¶ 89 *with Copperfield Report*, n. 65 (citation to October 19, 2012 8-K);

- the Complaint repeats blatant misreadings of disclosures that are copied verbatim from the *Copperfield Report*; *See infra*, § II.B(1, 3 & 5);

- the Complaint contains allegations that have no factual basis other than the unsubstantiated speculation in the *Copperfield Report*, *see infra* n. 15 & n.18; and

- the Complaint cites no evidence of loss causation beyond the market reaction to the *Copperfield Report*. Compl. ¶¶ 121-128.

15

The problem with Plaintiffs' exclusive and ongoing reliance on the *Copperfield Report* is three-fold.  First, predicating a lawsuit on the speculation of a pseudonymous author who has no personal knowledge underlying their assertions does not satisfy the PSLRA.  *See, e.g., In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 630-31 (S.D.N.Y. 2008); *In re AOL, Inc. Repurchase Litig.*, No. 12-CV-03497, 2013 WL 4441516, *14-15 (S.D.N.Y. Aug. 19, 2013).[11] Notwithstanding Plaintiffs' quotations of the underlying source materials cited in the *Copperfield Report*, this is still insufficient to meet the pleading standards.

Second, the *Copperfield Report* is clear that it is based on information "obtained from public sources," which in most cases are the Company's own SEC filings.  *Report* at 1, 43-45.  In other words, Copperfield's analysis is premised on the theory that the "truth is hiding in plain sight"; but such a theory is nonsensical basis to assert fraud claims.  If company insiders were purportedly inflating the stock price by issuing false statements, why would they risk releasing truthful information which might cause the stock price to decline?

Third, the Complaint's reliance on the market reaction to the issuance of the *Copperfield Report* is insufficient to establish loss causation because the *Copperfield Report* merely repackaged information "obtained from public sources," all of which were disclosed prior to the posting of the report on January 8, 2013, *i.e.,* during the Class Period.  Courts have made clear that negative repackaging of previously published information -- which *Copperfield* admits on

---

[11] Even prior to the PSLRA, such allegations were insufficient.  *See, e.g., Walker v. S.W.I.F.T. SCRL*, 517 F.Supp.2d 801, 807 (E.D.Va. 2007) ("reliance on anonymous sources . . . cannot relieve Plaintiffs of their important Rule 11 obligation given the difficulty in determining the reliability. . because unless the source is later identified, there is no way to verify the reliability of the information"); *S. v. Tri-State Ins. Co. of Minn.*, 946 F.2d 581, 583 (8th Cir. 1991) (stating that if plaintiff had filed suit based on an anonymous tip regarding a financial statement "Rule 11 sanctions would be seriously considered.").  *See also Greenfield v. U.S. Healthcare*, 146 F.R.D. 118,127 (E.D. Pa. 1993) ("reliance across the board on a *Wall Street Journal* article alone . . .is insufficient to satisfy the requirements of Rule 11.").

the report's first page -- is insufficient. *See, e.g., In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2nd Cir. 2010) ("negative . . . characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the [author's] opinions").[12]

In sum, Plaintiffs' attempt to use the *Copperfield Report* as the key to the courthouse, roadmap for their complaint, and the linchpin of their loss causation theory is unavailing.

### B.   The Complaint Fails To Adequately Plead Falsity or Loss Causation

This section analyzes each purportedly false statement alleged in the Complaint.  With regard to each disclosures, the Complaint is insufficient because it selectively misquotes public filings, or the purportedly corrective disclosure was made prior to or contemporaneous with the underlying statement.  *Rombach v. Chang*, 355 F.3d 164, 172, n.7 (2d Cir. 2004) ("the test for whether a statement is materially misleading… is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'").  Moreover, with regard to each disclosure, although truthful disclosures were made during the Class Period, the Complaint alleges no market reaction to the disclosure of corrective facts.  This warrants dismissal.

1. Plaintiffs' Allegations Regarding the March 15, 2012 Year-End 2011 10-K (Ex. 12): Plaintiffs make three assertions regarding the 2011 10-K.  First, Plaintiffs assert that a statement in the 10-K that there was "a higher percentage of magicJack units being sold to retailers and distributors at wholesale prices as opposed to direct sales to customers at retail prices" was false. Compl. ¶ 117 (emphasis omitted); Ex. 10.  Plaintiffs contend that this statement was false

---

[12] *See also Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure"); *In re CRM Holdings, Ltd Sec. Litig.*, No. 10 CIV 975, 2012 WL 1646888 at *31 (S.D.N.Y. Mar. 4, 2013) ("[i]nvestors cannot establish loss causation merely by relying on an after-the-fact negative characterization of already public information"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) ("The mere negative characterization of existing facts that were never hidden from investors does not permit [plaintiff] to plead loss causation.").

because "*on the very same page of the same 2011 10-K*" it states that in "2011 and 2010, sales of the magicJack and magicJack PLUS units through retail outlets represented approximately 57% and 73% respectively." Compl. ¶ 118 (emphasis added). In other words, the corrective disclosure was made at the same time and on the very same page as the purportedly "misleading" statement; this "truth is hidden in plain sight" is a nonsensical theory and cannot support a fraud claim. *Cf. I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 763 (2d Cir. 1991) (rejecting argument that a statement is misleading where corrective disclosure was made on the same page of a prospectus). Moreover, even assuming *arguendo* that Plaintiffs had sufficiently alleged the first statement was false, Plaintiffs have not (and cannot) cite any market reaction to the revelation that the statement was false, and accordingly cannot establish loss causation.

Second, in a single paragraph, Plaintiffs make the naked assertion that the 2011 10-K was required to but failed to disclose Borislow's pledge of his stock as collateral. Compl. ¶ 39. Nowhere does the Complaint allege facts, however, that establish that Borislow had actually pledged his stock as of the date on which the 10-K was issued. While the Complaint does allege that collateral Borislow had pledged was sold in mid-May (nine weeks after the 2011 10-K was released), the Complaint is devoid of any factual allegation that Borislow had actually pledged his stock *at the time the 10-K was issued.* This is not sufficient under the PSLRA.

Third, in a single paragraph, Plaintiffs conclusorily assert that the Company's disclosure regarding its inventory position in the 2011 10-K was misleading. Compl. ¶ 99. The Complaint neither cites the purportedly misleading language, nor pleads any facts to support the assertion that the unspecified disclosure is misleading, nor any legal or accounting standard explaining why additional disclosure was required. This is not sufficient under the PSLRA.

18

2.  <u>Plaintiffs' Allegations Regarding the "March 4, 2012"[13] Q1 2012 10-Q (Ex. 13)</u>:

Parroting Copperfield's allegations, Plaintiffs assert that the company "manipulated and understated the depreciation expense of certain assets" by "arbitrarily chang[ing] the estimated useful life of its switches and other ancillary equipment from 3 years to either 10 or 15 years." Compl. ¶ 70, 72.  *Compare* Compl. ¶¶ 70-80 *with Copperfield* at 19.  Aside from being entirely conclusory, this assertion fails to plead a viable claim for three reasons.

First, the Plaintiffs acknowledge that this change in accounting estimate was clearly disclosed in the Q1 10-Q about which they complain.  *See* Compl. ¶ 72.  Again, "truth is hidden in plain sight" is not a viable theory of fraud.

Second, the plaintiffs do not allege that there was any market reaction to this disclosure. Again, Plaintiffs fail to adequately allege loss causation.

Third, Plaintiffs only advance conclusions that the change in accounting estimate violated generally accepted accounting principles ("GAAP").  They do not allege sufficient facts to support that assertion.  For example, Plaintiffs do not (and cannot allege) that magicJack's auditor refused to sign audit opinions because of the change in estimate, or that magicJack was required to restate its accounting because this change was in error.  Rather, Plaintiffs assert that the 10-15 year period used by magicJack is shorter than the useful lives used by two competitors. But the Complaint draws this conclusion from an apples-to-oranges comparison. *Compare* Compl. ¶ 72 (magicJack extended the estimate of useful life for "some of its switches and other ancillary equipment") *with* ¶ 74 (Vonage uses a shorter life for their "network equipment [i.e., "routers, gateways, and servers"] and computer hardware and furniture").  A "switch" is not a

---

[13] Although Plaintiffs allege the 10-Q was filed on March 4, Compl. ¶ 28, it was filed on May 4.

"router, gateway [or] server" and Plaintiffs' unsupported assertion that a switch cannot have a 10 to 15 year useful life, Compl. ¶ 76, is not sufficient under the PSLRA.[14]

3. <u>Plaintiffs' Allegations Regarding the May 18, 2012 Form 8-K (Ex. 14)</u>: Plaintiffs assert that magicJack's May 18, 2012 8-K is misleading in two ways.  First, the Plaintiffs assert that the 8-K "materially misrepresented" how many shares of magicJack stock the purchasers of Borislow's shares owned.  Compl. ¶¶ 45-55.  The language at issue in the 8-K states that Borislow sold shares to "the Company's Chairman [i.e., Vento], President [i.e., MacInnes], and three shareholders, each of which already beneficially owns more than five percent of magicJack's outstanding ordinary shares…"  Ex. 14.  Parroting Copperfield, the Plaintiffs contend that this was misleading because "neither Vento nor MacInnes owned more than 5% of the Company's outstanding stock."  *Compare* Compl. ¶ 51 *with Copperfield Report* at 28.

The plain language of the 8-K, however, is clear that the "each of which already beneficially owns more than five percent" clause describes the three shareholders that purchased stock, not the enumerated officers.  Ex. 14.  Plaintiffs (and Copperfield's) construction of this disclosure contorts basic principles of grammar, and ignores that (a) the clause follows directly after the phrase "three shareholders," not the description of Vento or MacInnes, and (b) the disclosure uses the phrase "which" (appropriate for the stockholders, which included entities) rather than "whom" (appropriate for natural persons, such as Vento and MacInnes).  But more importantly, even if this disclosure was in any way confusing, the Complaint itself acknowledges that Vento and MacInnes filed Form 4s with the SEC *on May 18, 2012* (*i.e.,* the same date as the 8-K) disclosing the extent of their holdings, which are clear that they did not own 5% of

---

[14] The Plaintiffs also assert (incomprehensibly) that the Company's 2012 10-K "understates the true impact of the change."  Compl. ¶ 77.  This disclosure was not made until April 2, 2013 -- almost three months after the end of the Class Period.  Accordingly, it could not have inflated the stock price during the Class Period.

magicJack's stock.  Compl. ¶¶ 51-52; Ex. 15 & 16.  The Complaint nowhere explains why, in light of this disclosure, the purported statement at issue was misleading.  This is not sufficient under the PSLRA.

Second, Plaintiffs (again parroting Copperfield) assert that the 8-K was misleading because Borislow committed "not to margin or pledge his remaining shares in the future." *Compare* Compl. ¶ 45 *with Copperfield* at 40.  Although Plaintiffs contend that Borislow pledged his shares after making this commitment, the only purported proof is based on Plaintiffs' (and Copperfield's) misreading of a Form 13G Borislow filed December 28, 2012 -- seven months after the pledge.  *Id.*  That Form 13G states that Borislow "***released*** as collateral 241,028 Ordinary Shares that served as security for a loan ***to*** unaffiliated third parties."  Ex. 17 (emphasis added).  The plain language of the Form 13G is clear that Borislow himself released shares that a third party had provided to him to secure a loan Borislow made ***to*** the third party.  The 13G does not state (nor are there any other allegations in the Complaint that support Plaintiffs' contention) that Borislow himself had pledged his own shares or was himself released.  Nor do Plaintiffs allege any market reaction.  This is not sufficient to avoid dismissal.

4.  <u>Plaintiffs' Allegations Regarding the June 4, 2012 Form 8-K (Ex. 11)</u>:  Plaintiffs contend that three aspects of this 8-K, which concerned the company's use of puts in conjunction with its stock repurchase program, were misleading.  *See* Compl. ¶¶ 101-106.  First, Plaintiffs contend that language in the 8-K that the strategy had "no [e]ffect on its balance sheet" was misleading, because the Company reported the asset value of the put positions ($2.2 million) on its year-end balance sheet.  Compl. ¶ 105.  The Plaintiffs (parroting Copperfield) mischaracterize the 8-K, which speaks only to how unrealized gains or losses in option positions would be reflected on the financial statements, noting that they would be reflected on the income statement

21

(i.e., "other income/loss") rather than the balance sheet; the disclosure does not suggest that the asset value of any put positions will not be reflected on the balance sheet. *See* Ex. 11 ("These puts can generate 'other income/loss' during a quarter depending on the movement of the Company's stock price with no affect on its balance sheet . . . [s]tock price drops can have an 'other income/loss' impact using the put/call strategy but with no affect on the balance sheet."). Such allegations "unsupported by factual assertions are insufficient." *ATSI,* 493 F.3d at 99.

Second , Plaintiffs allege that the June 4, 2012 8-K was misleading because it stated that "as of May 25th [2012], the Company had a minimal amount of put contracts outstanding." Compl. ¶ 106.  There are several flaws with this Plaintiffs' assertion:

- The company disclosed in its August 8, 2012 Q2 2012 10-Q that it had puts to purchase "928,400 ordinary shares for $24.7 million." Ex. 18 at 18.  Again, Plaintiffs' "truth is hidden in plain sight" theory is nonsensical and cannot support a fraud claim.

- Plaintiffs (parroting Copperfield) assert that this amount was not "minimal," but do not state facts that support this assertion, other than miscalculating the number of contracts at issue.[15]  Moreover, while the Plaintiffs note that the puts represented the potential repurchase of $24.7 million of magicJack stock, the Company had already disclosed that it intended to repurchase $100 million of its stock during the Class Period.  Ex. 12 & Ex. 6.  Moreover, as the Complaint notes, the total value of puts at year end 2012 was $2.2 million, Compl. ¶ 105, which is "minimal" given magicJack's market capitalization.

- Plaintiffs do not allege any market reaction attributable to the disclosure of the put position in the Q2 10-Q (Ex. 18).  Again, Plaintiffs fail to adequately allege loss causation.

Third, Plaintiffs assert that the June 4, 2012 8-K (as well as the 8-Ks that were released on September 6, October 19, and December 26, 2012) were all misleading in that they failed to disclose that the put strategy "contributed significantly to earnings."  Compl. ¶¶ 107-113.  The Plaintiffs conclusorily assert that these disclosures were misleading because the Company

---

[15] Parroting *Copperfield,* Plaintiffs allege there were "928,400 outstanding contracts."  *Compare* Compl. ¶ 106 *with Copperfield Report* at 25.  A put contract represents the right to purchase 100 shares, so the number of contracts at issue was less than 9,300.

reported in its year-end 10-K that it earned "$12.185 million in proceeds from the sale" of its put options and in particular quarters, the revenue was purportedly significant.  Compl. ¶¶ 114-115. But this assertion fails to consider that (a) the Company had repeatedly disclosed that its put positions would be marked-to-market and unrealized gains or losses would be recognized, *see* Ex. 10 at 61, and (b) in each of the 10-Ks and 10-Qs during the Class Period the Company disclosed gains associated with the puts.  *See* Ex. 10 at 31, 76 ($2.2 million gain); Ex. 13 at 25 ($1.656 million gain); Ex 18 at 7 ($371k loss); Ex. 19 at 4 (noting $3.44 million gain).  Given that the Company contemporaneously disclosed the revenue associated with the puts, Plaintiffs' "truth is hidden in plain sight" theory is nonsensical.  Nor do Plaintiffs allege any market reaction when the Company reported on the puts.

5.   Plaintiffs' Allegations Regarding the August 8, 2012 Q2 10-Q (Ex. 18):  Plaintiffs make two allegations regarding the accuracy of the Q2 10-Q.  First, Plaintiffs allege that the company should have taken a $3.1 million inventory write-down in Q2 2012 rather than the Q3 2012.  Compl. ¶ 81.  Plaintiffs acknowledge that the Company disclosed the write down in its Q3 10-Q, and that there was discussion in the Q3 earnings release 8-K that the write down was for "chips we procured when we were in danger of not having enough inventory as a result of the Tsunami in Japan."  Compl. ¶ 89.  The Complaint (parroting Copperfield) alleges that because the company disclosed a separate write down of "obsolete inventory" during Q2,  it should have taken both write-downs at that time.  *Compare* Compl. ¶ 93 with *Copperfield Report* at 22-23. The Complaint fails to allege, however, any factual basis for Plaintiffs' (or Copperfield's) assertion that the write down of chips in Q3 concerns the same materials that were written down in Q2.  Rather, the Complaint (without citing any factual support) baldly asserts that the inventory at issue which was written down was the same in both quarters, and posits (without

support) the Company "knew" it should have written it off in Q2.  Compl. ¶ 93.[16]  This is insufficient under the PSLRA.

Second, Plaintiffs (parroting Copperfield) contend that the Company failed to disclose in the Q2 (as well as the Q3) 10-Q a putative class action lawsuit filed in Alabama federal court on May 18, 2012 predicated on the purported failure of the Company to remit 911 fees to a county government, and that this omission rendered its disclosures regarding its legal proceedings (as well as a statement in a December 28, 2012 8-K that the Company had "little litigation") inaccurate.  Compl. ¶¶ 56-67.  Plaintiffs conclusory assertion that the failure to disclose the complaint misled investors fails to address (a) the Company's repeated and prominent disclosures of the regulatory risk associated with 911 fees, *see, e.g.,* Ex. 10 at 15 ("***our emergency and E911 calling services . . . may expose us to significant liability***") (emphasis added), and (b) the Madison County lawsuit was filed in open court and was dismissed without the payment of any damages on March 15, 2013 with no class ever being certified.[17]  Aside from speculating that the lawsuit represented a material liability (the only apparent source for which seems to be analysis copied from the *Copperfield Report*),[18] there are no facts pled that support

---

[16] The Complaint repeats two other conclusory assertions from Copperfield.  The Complaint asserts the fact the October 18, 2012 8-K stated the write-down included chips procured following the March 2011 Japanese tsunami somehow "provides additional evidence" that the write-down should have been taken earlier; this assertion is unexplained and makes no sense. Compl. ¶ 96.  Similarly, Plaintiffs assert that the Company "was actually writing off finished goods, or magicJacks" based on selective misreading of the Company's financials which fails to account for the fact that the Company's finished goods inventory would decrease because it was selling magicJacks.  Compl. ¶ 97.  Neither of these allegations satisfies the PSLRA.

[17] This is apparent from the docket.  *See* Ex. 20.  The Madison County complaint and docket are matters of public record of which this Court may take judicial notice.  *See, e.g., Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006) ("docket sheets are public records of which the court could take judicial notice."); *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 153–55 (2d Cir.2003) (taking judicial notice of prior litigation filings).

[18] The Complaint asserts the suit represented a potential liability of $42 million. This assertion is not found in the *Madison County* complaint (Ex. 21), and is lifted directly from the *Copperfield Report*.  *Compare* Compl. ¶ 65 with *Copperfield* at 26.  If defendants could be held liable for

Footnote continued on next page

24

the contention that investors were misled concerning this suit.  Again, Plaintiffs' "truth is hidden in plain sight" theory is nonsensical and cannot sustain a fraud claim.

**III.      THE SECTION 20(a) CLAIM MUST BE DISMISSED**

Section 20(a) of the Exchange Act creates a cause of action against defendants alleged to have been "control persons" of those engaged in the primary securities fraud.  *See* 15 U.S.C. § 78t(a).  Because Plaintiffs here have not alleged a primary violation of Section 10(b) and Rule 10b–5, they also have not established control person liability pursuant to Section 20(a). *See, e.g., ATSI*, 493 F.3d at 108.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs' Complaint should be dismissed with prejudice. In light of Plaintiffs' ample time to investigate this matter and two prior complaints, any potential motion to replead should be denied.

---

Footnote continued from previous page
third party speculation about the materiality of potential exposure from litigation, liability could be manufactured against every public company in America.

Dated:   September 13, 2013                    Respectfully Submitted,


                                              /s/ John A. Freedman

                                              Stewart D. Aaron
                                              ARNOLD & PORTER, LLP
                                              399 Park Avenue
                                              New York, New York 10022-4690
                                              Telephone: (212) 715-1114
                                              Facsimile: (212) 715-1399
                                              Email: stewart.aaron@aporter.com

                                              John A. Freedman
                                              ARNOLD & PORTER, LLP
                                              555 Twelfth Street NW
                                              Washington, D.C. 20004-1206
                                              Telephone: (202) 942-5316
                                              Facsimile: (202) 942-5999
                                              Email: john.freedman@aporter.com

                                              *Attorneys for Defendants magicJack*
                                              *Vocaltec Ltd., Andrew MacInnes, Daniel*
                                              *Borislow, Gerald T. Vento and Peter J.*
                                              *Russo*

26