UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

DOUGLAS TURNER, Individually and on Behalf
Of All Others Similarly Situated,

               Plaintiffs,            13 Civ. 0448

   -against-                        OPINION

MAGICJACK VOCALTEC, LTD., ANDREW MACINNES,
DANIEL BORISLOW, GERALD T. VENTO, and PETER
J. RUSSO,

               Defendants.

------------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/3/14

Attorneys for the Defendants MAGICJACK VOCALTEC LTD.
et al.

ARNOLD & PORTER, LLP
555 Twelfth Street NW
Washington, DC. 20004
By:  John A. Freedman, Esq.

ARNOLD & PORTER, LLP
399 Park Avenue
New York, NY 10022
By:  Stewart D. Aaron, Esq.

Attorneys for Lead Plaintiffss and the Class

POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Fl.
New York, NY 10016
By:  Marc I. Gross, Esq.
     Jeremy A. Lieberman, Esq.
     Murielle J. Steven Walsh, Esq.

Star Mishkel Tyner, Esq.

THE ROSEN LAW FIRM
275 Madison Avenue, 34th Fl.
New York, NY 10016
By:  Laurence M. Rosen, Esq.
     Phillip Kim, ESq.

Attorney for Plaintiffs Douglas L. Turner

BRONSTEIN GEWIRTZ & GROSSMAN LLP
60 East 42nd Street, Suite 4600
New York, NY 10165
By:  Peretz Bronstein, Esq.

**Sweet, D.J.**

Defendants magicJack VocalTec Ltd. ("magicJack" or the "Company"), Andrew MacInnes ("MacInnes"), Daniel Borislow ("Borislow"), Gerald Vento (Vento") and Peter Russo ("Russo") (collectively "Defendants") move to dismiss the Second Amended Complaint ("SAC") of Plaintiffs Douglas Turner, individually and on behalf of all others similarly situated ("Turner" or "Plaintiffs").

For the reasons set forth below, Defendants' motion is granted.

**Procedural History**

Plaintiffs filed the first Complaint on January 18, 2013, and the First Amended Complaint ("FAC") on March 12, 2013.

On April 26, 2013, pursuant to Section 21 D(a)(3)(B) of the Exchange Act, 15 U.S.C. §7Su-(a)(3)(B), the magicJack Investor Group and its members were appointed as Lead Plaintiffs for the class because they have the largest financial interest in this litigation and otherwise satisfy the requirements of Fed. R. Civ. P. 23, and the Rosen Law Firm P.A. and Pomerantz

2

Grossman Hufford Dahlstrom & Gross LLP were appointed Co-Lead
Counsel.

On July 22, 2013, Plaintiffs filed their Second
Amended Complaint ("SAC").  Defendants filed their motion to
dismiss the SAC on September 13, 2013.

Defendants' motion was heard and marked fully
submitted on November 20, 2013.

**Facts**

This is a securities class action on behalf of
purchasers of magicJack securities during the period from
February 28, 2012, through and including January 8, 2013 (the
"Class Period").  (Compl. ¶ 1.)

MagicJack is an Israeli company that develops and
sells software and hardware for making telephone calls over the
internet.  (Compl. ¶¶ 2, 15, 21-23.)  Plaintiffs allege that
between the period of February 28, 2012 through January 8, 2013,
the Company made a series of "false and/or misleading statements
and/or failed to disclose material facts . . . for the purpose
of keeping the Company's stock price inflated."  (Compl. ¶ 3.)

The Complaint also alleges that the Company failed to (1) disclose a lawsuit (Compl. ¶¶ 56-57); (2) record an inventory write-down (Compl. ¶¶ 81-100); (3) disclose the significance of revenue recorded from puts (Compl. ¶¶ 107-115); and (4) disclose that Borislow had pledged his stock (Compl. ¶¶ 34-46). In addition, the Complaint maintains that throughout the Class Period, magicJack was engaged in a buyback program to repurchase $100 million of its stock. (Compl. ¶¶ 104, 106.)

The individual Defendants are officers and directors of magicJack during the Class Period.

Borislow served as magicJack's CEO from the beginning of the Class Period through December 2012. (Compl. ¶ 16.) Borislow is alleged to have pledged "over one million of his shares of magicJack as collateral against personal debt," (Compl. ¶ 34), which he was alleged to have sold to "long term and strategic investors, including the Company's Chairman, President and three shareholders," at a price which represented a "$3.7 million discount from then-current market prices." (Compl. ¶¶ 42, 145.)

On May 9, 2012, Thompson Reuters published an article detailing how the CEO of Green Mountain Coffee Roasters had been

ousted after he had sold pledged shares to meet margin calls. The article quoted former SEC chairman Arthur Levitt, stating, "The perception of management borrowing against their own holdings is so bad . . . I would encourage shareholders to push companies to implement such protections where they don't exist." (Compl. ¶ 41.)    Nine days later, Defendants revealed in a form 8-K filed on May 18, 2012 that Borislow disposed of 1.1 million magicJack shares for "liquidity," that the decision had been "moved along quicker" by recent news regarding executive margin accounts, and that Defendants Vento and MacInnes were among the group of investors purchasing Borislow's shares at below market prices.    (Compl. ¶¶ 4, 43.)    The amount of stock sold represented more than 5 percent of the Company's outstanding float.    (*Id.*)    The May 18 8-K also stated that Borislow had agreed not to pledge his shares in the future.    After this disclosure, magicJack shares declined $1.13 per share, or 6 percent over two trading sessions, to close at $17.74 per share on May 18, 2012.   (Compl. ¶ 5.)

According to the Complaint, Defendants did not disclose Borislow's pledges prior to this announcement, even though such disclosure was required.  (Compl. ¶ 4.)  Item 403(b) of Regulation S-K requires disclosure of the number of shares pledged as security by named executive officers and directors.

5

*See* 17 C.F.R. § 229.403.  For persons required to file Schedule 13D with the SEC, pledges of securities are required to be disclosed within ten days of the pledge, as well as "material" sales that result from any margin call or foreclosure.  *Id.* at § 240.13d-2(a); (Compl. ¶ 45.)

Borislow is also alleged to have been the beneficiary of a program disclosed in the July 23, 2012 proxy statement that would have awarded him 50,000 shares for each dollar of earnings per share reported starting at year end 2012.  The Complaint does not allege that Borislow was actually awarded any shares under this agreement and notes that Borislow resigned from the Company on December 28, 2012, and accordingly left before he was eligible for the award.

MacInnes was President of the Company between just before the beginning of the Class Period (February 2012) until December 2012.  (Compl. ¶ 17.)  According to the Complaint, MacInnes is alleged to have purchased some of the stock Borislow sold on May 18, 2012.  (Compl. ¶ 52.)  MacInnes is not alleged to have sold any of his stock personally.

Vento was President and CEO of the Company for the last seven days of the Class Period (between January 1 and

6

January 8, 2013), and previously was Chairman of the Board of Directors starting in April 2012, one month after the Class Period started. (Compl. ¶ 18.) Vento is also alleged to have purchased some of the stock Borislow sold on May 18, 2012, and to have signed the 2012 Form 10-K three months after the end of the Class Period. (Compl. ¶¶ 31, 53.) Vento is not alleged to have sold any of his stock personally.

Russo was CFO of the Company "at all relevant times" during the Class Period. (Compl. ¶ 19.) He is alleged to have signed the 2011 and 2012 Form 10-Ks, and Forms 10-Q for each of the first three quarters of 2012. (Compl. ¶¶ 27-31.) Russo is also alleged to have signed the May 18, 2012 8-K disclosing Borislow's stock sale to MacInnes and Vento, but is not alleged to have sold any of his stock personally. (Compl. ¶ 54.)

On January 9, 2013, Copperfield Research posted the "Copperfield Report." (Compl. ¶ 121.) The Report asserted that a number of the Company's securities filings were inaccurate, including each of the purported misrepresentations identified in the Complaint, and contained 125 citations to the Company's previously filed disclosures and other public information. Plaintiffs allege that in response to the Report, magicJack's

7

stock price fell $2.01 per share or 11.6 percent.   (Compl. ¶ 128.)

The report noted the existence of class action litigation on behalf of at least 100 counties alleging that the Company had failed to collect 911 charges, with damages claimed in excess of $5 million.   (Compl. ¶ 6.)   The Company's SEC filings did not mention the suit, and instead represented that total litigation liabilities ranged from "0 to less than $1.5 million" and that there was no material litigation.   (Compl. ¶¶ 60-61.)   In a December 2012 press release, Borislow also represented that magicJack had "little litigation."   (Compl. ¶ 62.)

The Copperfield Report further claimed that Defendants misrepresented the identities of the purchasers of Borislow's stock sale.   (Compl. ¶ 47.)   The May 18 8-K represented that the stock was sold to "long term and strategic" investors, including three investors "each of which already beneficially owns more than five percent of magicJack's outstanding ordinary shares."   (Compl. ¶ 48.)   Plaintiffs allege that the Schedule 13D filings around the time of the sale show that only one shareholder, Adam Street Partners LLC, existed who could fit the May 18 8-K's description.   (Compl. ¶ 53.)

8

In addition, the Report maintained that the Company was committing accounting manipulations. (Compl. ¶123, 125.) For example, in the first quarter of 2012, the Company allegedly arbitrarily changed the estimated useful life of its switches and ancillary equipment from 3 years to 10-15 years (Compl. ¶ 72), cutting depreciation expenses by at least 50 percent or $1.6 million in 2012. (Compl. ¶ 79.) The Company also allegedly materially omitted accurate inventory write-downs (Compl. ¶ 125), recording a $3.1 million inventory write-down over the second and third quarters of 2012, when, in fact, the Company should have recorded the entire amount in the second quarter. (Compl. ¶ 81.) Defendants' failure to take the entire inventory write-down earlier overstated income and understated expenses by $2.1 million, or 20.4 percent in the second quarter of 2012. (Compl. ¶¶ 94, 100.) This omission enabled Defendants to report a "record breaking" 25 percent increase in income and 28 percent increase in earnings per share, though if the Company had recorded the write-down, its income would have remained substantially unchanged from the prior period. (Compl. ¶ 94.) Furthermore, in writing down the inventory, while claiming to write off raw materials like chips, Defendants wrote off finished goods, i.e. magicJacks. (Compl. ¶ 97.) Writing off finished goods would have signaled to

9

investors that the actual demand for magicJack's products was lower than the projections the Company utilized for determining the required levels of inventory and manufacturing activity. (*Id.*)

The Report also detailed Borislow's alleged securities law violations, and asserted that he had previously been accused of securities fraud for issuing misleading earnings with his old company, Tel-Save. (Compl. ¶¶ 25, 122.) The Report also called into question whether Borislow had reneged on his commitment "not to margin or pledge his remaining shares in the future." (*Id.*) It noted that, the day he resigned as CEO on December 28, 2012, Borislow gifted 2 million of his shares to trusts and released as collateral 241,028 shares serving as security for a loan to "unaffiliated third parties." (*Id.*) This pledge was not disclosed until the day of Borislow's retirement. (Compl. ¶ 45.)

Finally, the Report maintained that the Company had made misrepresentations concerning its put option strategy by misleading investors about the true nature of the Company's earnings, (*see* Compl. ¶¶ 107, 109-11), and withholding the strategy's potential risks and exposure to significant losses. (*Id.*) On May 29, 2012, the Wall Street Journal ("WSJ")

10

published an article entitled "MagicJack 'Puts' Money on the
Line," stating that:

> The strategy worked like this: MagicJack brought in
> cash by selling put options.  Those options gave third
> parties the right to sell MagicJack shares to the
> Company for a set price . . . .  The options would
> generally only be exercised if the share price fell.
> As long as it didn't, the income from selling puts was
> pure profit . . . .  [The sale of put options]
> accounted for 20% of MagicJack's first-quarter profit
> . . . .  However, if the price of MagicJack shares
> declined, it could have been a costly trade.

(Compl. ¶ 102.)  MagicJack stock fell $1.59 per share, or 9.4
percent, by the end of the day on May 29, 2012 after the article
was published, and by an additional $1.52 or 9.9 percent the
following day.  (Compl. ¶ 103.)

On June 4, 2012, Defendants responded to the article
with a press release that claimed that (1) "[t]hese puts can
generate 'other income/loss' during a quarter depending on the
movement of the Company's stock price with no affect on its
balance sheet" (Defendants' Memorandum, "Def. Mem."; Ex. 11);
(2) as of May 25, the Company had a "minimal" amount of puts on
its book, and (3) it would minimize its reliance on the strategy
going forward.  The Copperfield Report, and the Complaint, both
maintain that this press release was inaccurate, emphasizing
that if the Company had to pay out substantial amounts in the

11

event of stock price decline, the Company's cash position would be heavily impacted and would affect the balance sheet. The Report also pointed out that the Company had over $24.7 million worth of put obligations remaining on its books as of June 30 (as reported in the second quarter 10-Q filed on August 8, 2012), contrary to Defendants' previous purported misrepresentation that their put position was "minimal."

## The Applicable Standard

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235-36 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)

(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

Plaintiffs must allege sufficient facts to "nudge[ ] their

claims across the line from conceivable to plausible." *Twombly,*

550 U .S. at 570.  Though the court must accept the factual

allegations of a complaint as true, it is "not bound to accept

as true a legal conclusion couched as a factual allegation."

*Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555).

    In a private securities fraud action, "[u]nder the

PSLRA's heightened pleading instructions," enacted in 1995 "[a]s

a check against abusive litigation by private parties," *Tellabs,*

551 U.S. at 313, 321, the plaintiffs must do more. *See, e.g.,*

*Teamsters Local 445 Freight Division Pension Fund v. Dynex*

*Capital Inc.,* 531 F.3d 190, 194 (2d Cir. 2008) ("*Teamsters Local*

*445* "). Section 21D(b)(2) of the PSLRA, codified at 15 U.S.C. §

78u-4(b)(2), provides that

> [i]n any private action arising under this chapter in
> which the plaintiffs may recover money damages only on
> proof that the defendant acted with a particular state
> of mind, *the complaint shall,* with respect to each act
> or omission alleged to violate this chapter, *state*
> *with particularity facts giving rise to a strong*
> *inference that the defendant acted with the required*
> *state of mind.*

15 U.S.C. § 78u-4(b)(2) (emphases added).

## I. Plaintiffs Fails to Adequately State a Claim Under Section 10(b) and Rule 10b-5

Plaintiffs allege that Defendants made various actionable misstatements by (1) failing to disclose a material lawsuit; (2) failing to disclose that Borislow pledged his magicJack shares; (3) misrepresenting facts regarding the Company's put option strategy; and (4) inflating the financial results through GAAP violations and accounting manipulations.

### A. *Applicable Standard Under Section 10(b) and Rule 10b-5*

To state a claim under Section 10(b) and Rule 10b-5, the "plaintiffs must allege that the defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiffs relied, and (5) plaintiffs' reliance was the proximate cause of its injury." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

### B. *Plaintiffs Fail to Adequately Plead Material Misstatements or Omissions*

Plaintiffs allege numerous misstatements by Defendants that were purportedly actionable. To plead material misstatements, the Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the

14

statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-4(b)(1)(B).

First, Plaintiffs contend that Defendants falsely misrepresented that they had no material litigation liabilities and that their legal liabilities amounted to "0 to less than 1.5 million," by failing to disclose the Madison Count class action lawsuit. (Compl. ¶¶ 58-64.)   Plaintiffs maintain that magicJack was obligated to disclose the lawsuit under applicable SEC regulations.   See 17 C.F.R. § 229.103 (requiring disclosure of "any material pending legal proceedings, other than ordinary routine litigation incidental to the business").   Further, according to Plaintiffs, once Defendants chose to speak on the amount of their legal liabilities, they had "a duty to be both accurate and complete."   Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002); see also Hall v. Childrens' Place Retail Stores, Inc., 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008).

The Madison County lawsuit was filed in open court, the complaint and docket are matters of public record, and the suit was dismissed on March 15, 2013 without the payment of any damages and with no class ever having been certified. (Id.; Ex.

15

20.)  Further,  the  Company  repeatedly  disclosed  the  regulatory
risk  associated  with  911  fees,  the  practice  upon  which  the  suit
was  predicated.    (Defendant's  Memorandum  ("Def.  Mem.");  Ex.  10
at  15  ("our  emergency  and  E911  calling  services  .  .  .  may  expose
us  to  significant  liability.").)    The  Complaint's  assertion  that
the  suit  represented  a  potential  liability  of  $42  million  is  not
found  in  the  Madison  County  complaint  (*id.*;  Ex.  21)  and  is  not
supported  other  than  with  reference  to  the  Copperfield  Report.
(Compl.  ¶  65.)    There  are  no  facts  pled  for  the  contention  that
the  suit  incurred  such  potential  liability  or  that  investors
were  misled  concerning  the  suit.    Plaintiffs  do  not  and  cannot
assert  that  any  payment  was  actually  made  that  rendered  the
Company's  statements  regarding  its  pending  litigation
inaccurate.    *See Bond Opty Fund v. Unilab Corp.*,  87  Fed.  Appx.
772,  773  (2d  Cir.  2004).    As  such,  Plaintiffs  do  not  show  that
Defendants  materially  misrepresented  their  potential  liability
or  materially  omitted  relevant  information.


        Second,  Plaintiffs  maintain  that  Borislow's  stock
pledge  should  have  been  disclosed  in  the  2011  10-K.    Plaintiffs
cite  in  support  of  this  date  that  (1)  Borislow's  sale  was  "moved
along  quicker"  by  "recent  highly  publicized  news  events
pertaining  to  Board  Members  and  executive  margin  accounts  (i.e.
the  May  9  Reuters  article)  (*see*  Compl.  ¶  42);  (2)  Borislow

16

"committed not to margin or pledge his remaining shares in the future," suggesting that he had pledged his shares in the past (*see id.*); (3) Borislow's base salary was $200,000, and most of his net worth is in magiJack stock; and (4) Borislow had not previously filed any Schedule 13Ds as required disclosing the existence of the pledge.  Even taken together, these allegations are insufficient to show, beyond mere speculation, that Borislow had actually pledged his stock as of the time the 10-K was issued, nine weeks before the May 18 stock sale.  *See Bond Opty Fund*, Fed. Appx. at 773 ("Mere speculation is insufficient to satisfy the PSLRA pleading standard.").  Further, Plaintiffs' allegation that the Borislow pledge should have been disclosed in the "May 4, 2012 10-Q" was not made in the Complaint, *see Wright v. Ernst & Young, LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (a plaintiff may not amend its complaint in motion papers), and in any event there is no SEC disclosure requirement that the Company disclose any officer, director or stockholder's ownership in a Form 10-Q.  Regulation S-K Item 403, which governs disclosure of stock pledges, applies only to Form 10-K, not to Form 10-Q.  *See* 17 C.F.R. § 229.403 & Instructions to Form 10-Q (Item 403 disclosure not required).  Plaintiffs thus fail to allege that Borislow or the Company misrepresented or omitted Borislow's stock pledge in any required form disclosure.

Third, Plaintiffs assert that the May 18 8-K "materially misrepresented" how many shares of magicJack stock the purchasers of Borislow's shares owned. The language at issue in the 9-K states that Borislow sold shares to "the Company's Chairman (i.e. Vento), President (i.e. MacInnes), and three shareholders, each of which already beneficially owns more than five percent of magicJack's outstanding ordinary shares." (Def. Mem. Ex. 14.) Plaintiffs contend that this was misleading because "neither Vento nor MacInnes owned more than 5% of the Company's outstanding stock." (Compl. ¶ 51.) The plain language of 8-K, however, is clear that the "each of which already beneficially owns more than five percent" clause describes the three shareholders that purchased stock, not the enumerated officers. (Def. Mem. Ex. 14.) The phrase follows directly after the phrase "three shareholders," not the description of Vento or MacInnes, and uses the phrase "which" (appropriate for entities including stockholders) rather than "whom" (appropriate for natural persons such as Vento and MacInnes). Moreover, the Complaint acknowledges that Vento and MacInnes filed Form 4s with the SEC on May 18, 2012, the same day of the 8-K, disclosing the extent of their holdings, and making clear that the Company was not intending to misrepresent that Vento or MacInnes owned more than 5% of the Company's outstanding stock. (Compl. ¶¶ 51-52.)

18

Fourth, Plaintiffs assert that the May 18 8-K was misleading because Borislow committed "not to margin or pledge his remaining shares in the future," (Compl. ¶ 45), but purportedly pledged his shares after making this commitment. Plaintiffs base this contention on a Form 13G filed by Borislow on December 28, 2012, seven months after the pledge. The Form states that Borislow "released as collateral 241,028 Ordinary Shares that served as security for a loan to unaffiliated third parties." (Def. Mem. Ex. 17.) The Form does not state that Borislow pledged his own shares or was himself released, but instead shows that Borislow released shares that a third party had provided to him to secure a loan. As such, Plaintiffs fails to show any misrepresentation.

Fifth, Plaintiffs assert that the Company's disclosure regarding its inventory position in the 2011 10-K was misleading (Compl. ¶ 99), but do not cite the purportedly misleading language, plead any facts to support the assertion, or cite any legal or accounting standard explaining why the additional disclosure was required.

Sixth, Plaintiffs contend that the Company used, without disclosure, a highly risky put option trading strategy

19

that exposed investor cash to significant losses. (Compl. ¶ 107.) The Complaint alleges that Defendants misrepresented the put option strategy in the June 4 8-k, which concerned the company's use of puts in conjunction with its stock repurchase program, in several respects.

As an initial matter, Plaintiffs allege that the Company stated that the put option strategy had "no [e]ffect on its balance sheet," but reported the asset value of the put positions as $2.2 million. (Compl. ¶¶ 101-06.) Taken in context, though, the 8-K speaks only to how unrealized gains or losses in option positions would be reflected on financial statements, noting that they would be reflected on the income statement, rather than the balance sheet. The disclosure does not suggest that the asset value of any put positions would not be reflected on the balance sheet. (*See* Def. Mem. Ex. 11 ("These puts can generate 'other income/loss' during a quarter depending on the movement of the Company's stock price with no affect on its balance sheet . . . [s]tock price drops can have an 'other income/loss' impact using the put/call strategy but with no affect on the balance sheet.").

Next, Plaintiffs allege that the 8-K was misleading because it stated that "as of May 25, 2012, the Company had a

20

minimal amount of put contracts outstanding." (Compl. ¶ 106.)
However, the Company disclosed in its August 8, 2012 Q2 2012 10-
Q that it had puts to purchase "928,400 ordinary shares for
$24.7 million." (Def. Mem. Ex. 18 at 18.) The Company had also
disclosed that it intended to repurchase $100 million of its
stock during the Class Period. (Def. Mem. Ex. 12; Ex. 6.) As
such, there was no misrepresentation. In any event, a put
contract represents the right to purchase 100 shares, so the
number of contracts at issue was less than 9,300 and the total
value of puts at year end 2012 was $2.2 million, which can be
considered minimal given magicJack's market capitalization.
(*See* Compl. ¶109 ("[I]t is too early to predict total revenue,
but it should exceed $34 million for the quarter" for June
2012.)


       Plaintiffs also maintain that the 8-K on June 4, and
those released on September 6, October 19, and December 26, were
misleading in that they failed to disclose that the put strategy
"contributed significantly to earnings." (Compl. ¶¶ 107-113.)
The Company, though, had repeatedly disclosed that its put
positions would be market-to-market and unrealized gains or
losses would be recognized, and in each of the 10-Ks and 10-Qs
during the Class Period the Company disclosed gains associated
with the puts. (*See* Def. Mem. Ex. 10 at 31, 76 ($2.2 million

gain); Ex. 13 at 25 ($1.656 million gain); Ex. 18 at 7 ($371k
loss); Ex. 19 at 4 (noting $3.44 million gain).)   The Company
thus disclosed the revenue associated with the puts
contemporaneously with the purported misrepresentation, and as
such did not materially misrepresent its position. *See Meyer*
*Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 763
(2d Cir. 1991) (where a report contains the fact that is
defendant is alleged to have misrepresented, it cannot be
misleading).

Finally, Plaintiffs assert that the Company violated
GAAP provisions by "using an incorrect useful life" in
depreciating its switches, and that the Company should have also
taken a $3.1 million inventory write-down in Q2 2012 rather than
just in Q3 2012.   (Compl. ¶ 81.) Further indicative of the
Company's manipulations, according to Plaintiffs, is Defendants
misclassification of its "trading" securities as "available for
sale."   (Compl. ¶ 115.)   By so doing, Defendants allegedly
failed to include unrealized losses and gains to net income in
the financial statements as required by GAAP, and avoided
earnings volatility.

With respect to the switches, Plaintiffs' assertion
rests on the Copperfield Report's comparison of the useful life

22

of telecommunication switches to the useful life of Computer network equipment, such as routers, gateways, and servers. There is no support for this comparison or for the Report's contention that the materials were all required to be written at the same time.  A "switch" is not a "router, gateway [or] server," and Plaintiffs' unsupported assertion that a switch cannot have a 10 to 15 year useful life (*see* Compl. ¶ 76) is thus insufficient.  Further, the change in useful life was disclosed in the Q1 2012 10-Q.  (Compl. ¶ 72.)

In terms of the write-downs, the Complaint alleges that because the Company disclosed a separate write down of "obsolete inventory" during Q2, it should have taken both write-downs at that time.  (Compl. ¶ 93.)  However, Plaintiffs acknowledge that there was discussion in the Q3 earnings release 8-K that the write-down was for "chips we procured when we were in danger of not having enough inventory as a result of the Tsunami in Japan." (Compl. ¶ 89.)  There is thus no basis for the assertion that the write-downs of chips in Q3 concern the same materials that were written down in Q2.  Further, the Company disclosed the write-down in its Q3 10-Q.  Plaintiffs do

not explain how this constitutes an improperly accounted for write-down.[1]

Generally, Plaintiffs also fail to allege that magicJack's auditor refused to sign audit opinions, or that magicJack was required to restate its accounting because a change was in error. To the contrary, there has been no restatement, magicJack's auditor issued opinions that the financial statements were prepared in accordance with GAAP, and magicJack and its auditors support the accounting position in the financial statements. As such, Plaintiff fails to adequately allege any GAAP violations.

Plaintiffs have thus failed to specify with particularity any facts which, read in context, demonstrate that Defendants were materially misleading or materially omitted information. *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *accord ATSI*, 493 F.3d at 99 ("Allegations that are

---

[1] Plaintiffs maintain that the Complaint has pled actionable misstatements by the Defendants with respect to their accounting manipulations, and does not have to prove the falsity of the misrepresentations, citing *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 125 (S.D.N.Y. 2013) ("It is sufficient for plaintiffs to point to circumstances that, drawing reasonable inferences in their favor, would render their claims plausible. Reporting discrepancies of the large magnitude of those alleged by Plaintiffs" are sufficient). Here, though, Plaintiffs have not alleged any discrepancy of such "magnitude," or pled facts supporting the various assertions of error. As such, Plaintiffs' conclusory allegations are insufficient.

conclusory   or   unsupported   by   factual   assertions   are
insufficient.").

   C. *Plaintiffs Fail to Adequately Allege Scienter*

   To adequately allege scienter, Plaintiffs must advance
an inference of scienter that is "more than merely plausible or
reasonable." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551
U.S. 308, 324 (2008).   The allegations must give rise to an
inference of scienter that is "cogent and at least as compelling
as any opposing inference" of non-fraudulent intent. *Id.*

   Even if the misrepresentations pled by Plaintiffs were
adequate, the Complaint fails to adequately plead scienter, or
that Defendants acted with "a mental state embracing intent to
deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 319.

   As evidence of scienter, the Complaint alleges that
(1) Borislow had actual knowledge of his stock sales and pledge
which  he  failed  to  disclose;  (2)  the  put  option  strategy
provided  Defendants  with  a  concrete  and  powerful  motive
indicative  of  scienter;  (3)  the  Company  knew  of  and  did  not
disclose  the  Madison  County  lawsuit;  and  (4)  the  GAAP
violations, taken as a whole, weigh in favor of scienter.

Plaintiffs allege that both Borislow's stock pledge and the put option strategy incentivized the Company to inflate magicJack's stock price, as a decline could have triggered a margin call or decrease in available credit. Further, the put strategy option allegedly provided Defendants with motive, because the Company's success hinged on the stock price staying above a certain level. (Compl. ¶¶ 133-44.)

As an initial matter, motives such as the desire to keep stock prices high to avoid triggering liabilities or to increase executive compensation are not a sufficient basis for scienter. *See, e.g.*, *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 450 (S.D.N.Y. 2005) (insufficient motives include "the desire for the corporation to appear profitable and . . . the desire to keep stock prices high to increase officer compensation."). "In attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 109-10 (2d Cir. 2009) (internal citations omitted).

26

Though the desire to inflate stock prices may support a viable claim when a defendant sells his own shares, the sale must be "unusual or suspicious in timing." *See, e.g.*, *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (insider stock sales must be "unusual" or "suspicious" in order to establish motive); *Glaser v. The9 Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (whether sales are "unusual" or "suspicious" depends on the percentage of holdings sold and the number of defendants selling). Here, Borislow's personal sale of stuck during the Class Period was not unusual or suspicious. Rather, Borislow's sale was intended for liquidity and was below (approximately 50 percent) the Class Period high of $27 per share. (Def. Mem.; Exs. 10 at 92, 12 at 29.) Because Borislow's sale was not unusual in timing, was not at the high of the Class Period, and no alternative motive aside from general profit is adequately alleged, "the allegation is not so specific as to give rise to a strong inference of scienter." *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 438 (S.D.N.Y. 2010) (no scienter where plaintiffs did not allege what percentage of shares defendants sold or why the sale was unusual or suspicious aside from general motive for profit); *see also 380544 CANADA, INC. v. Aspen Tech.*, 544 F. Supp. 2d 199, 221 (S.D.N.Y. 2008) ("Stock ownership establishes motive

only if defendants are also alleged to have benefitted from an inflated stock price in a particular manner, for example, by selling a large number of shares shortly after the alleged fraud.") (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130-31 (2d Cir.1994)).

Similarly, Borislow's compensation package does not give rise to scienter, as Borislow never received any compensation pursuant to the incentive and "executive compensation dependent upon stock value does not give rise to a strong inference of scienter" because "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Gr., Inc.,* 47 F.3d 47, 54 (2d Cir. 1995).

In addition, Vento, Russo, or MacInnes did not sell shares of magicJack.  To the contrary, Vento and MacInnes individually purchased stock during the Class Period.  (Compl. ¶ 42, 48, 51, 52.); *see also In re MRU Holdings Sec. Litig.,* 769 F. Supp. 2d 500, 519 (S.D.N.Y. 2011) (purchase and "retention of the shares ... [is] inconsistent with the allegation that [they] harbored information that the Company's financial health was in grave jeopardy.") (quoting *In re Keyspan Corp. Sec. Litig.,* 383

F.Supp.2d 358, 383 (E.D.N.Y.2003)).  The Complaint does not
address why MacInnes and Vento would have purchased Borislow's
shares if, as the Plaintiffs allege, the individual Defendants
were conspiring to artificially inflate the Company's stock
price.  That three of the four individual Defendants, all high-
ranking executives at the Company, did not sell stock during the
Class Period, and that two of these Defendants instead purchased
stock during the relevant period, rebuts an inference of
scienter.  *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 457 F.
Supp. 2d 266, 289 (S.D.N.Y. 2006) (lack of stock sales tends to
negate inference of scienter); *In re N. Telecom Sec. Litig.*, 116
F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock
sales by insiders  . . . is inconsistent with an intent to
defraud shareholders."); *San Leandro*, 75 F.3d at 814 (the
failure of some defendants to sell stock during class period
undermined the plaintiffs' allegations that any defendant
intended to inflate stock for personal profit).

        Independently, as set forth in the Complaint, during
the Class Period, magicJack was engaged in a massive, $100
million stock buyback.  It is unreasonable to assume that
magicJack would artificially inflate its stock price when it was
repurchasing a significant amount of its own shares on the open
market.  As courts in this district have recognized, a "strategy

of repurchasing stock at a knowingly inflated price would be economically irrational." *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at *13 (S.D.N.Y. Sept. 28, 2012) (quoting *Davidoff v. Farina,* No. 04 Civ. 7617(NRB), 2005 WL 2030501, at *11 n. 19 (S.D.N.Y. Aug. 22, 2005) (granting motion to dismiss where "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail"))[2].

Moreover, with respect to the put option allegations, the put strategy was used to effectuate the stock buyback by locking-in advantageous pricing. (*See* Compl. ¶ 133-44, Ex. 13 at 27 ("We have sold common equity put option contracts in connection with our share repurchase program in order to lower the average share price paid for ordinary shares we purchase[]"); Ex. 11 (the Company "used sales of puts and purchases of calls to reduce the cost of some share repurchases . . . [t]he put/call strategy used by the Company is the same cash outlay for repurchases regardless of moves in the stock price as the puts guarantee the Company can lock-in a repurchase price if put the stock"); ¶ 143 (the puts were for magicJack "to

---

[2] Plaintiffs' single cited case to the contrary, *Guilford Mills*, 1999 WL 33248953, at *5 (S.D.N.Y. Jul. 21, 1999), is inapposite because it involved allegations that four defendants sold significant portions of their stock holdings at inflated prices and that "the company was not aware of the fraud or the effect its exposure would have on the value of the stock." *Id.* Here, in contrast, three of the four individual Defendants did not sell stock, and two bought stock during the relevant period.

purchase its own shares"). The Complaint fails to explain how a strategy to repurchase stock is consistent with an incentive to artificially inflate the stock price.

Plaintiffs also contend that failure to disclose the Madison County lawsuit supports an inference of scienter through actual knowledge. Under applicable SEC regulations, magicJack was obligated to disclose "material pending litigation." *See* 17 C.F.R. § 229.103 (requiring disclosure of "any material pending legal proceedings, other than ordinary routine litigation incidental to the business").

As discussed, Plaintiffs failed to plead any omission or misrepresentation related to the lawsuit. The suit was predicated on the purported failure of the Company to remit 911 fees to a county government. (Compl. 56-67.) The Company repeatedly disclosed this regulatory risk associated with 911 fees. (Defendant's Memorandum ("Def. Mem."); Ex. 10 at 15 ("our emergency and E911 calling services . . . may expose us to significant liability.").) The lawsuit itself was dismissed without the payment of any damages or any other material consequence for the Company. Moreover, the suit was filed in open court, and no class was ever certified. Further, the Complaint's assertion that the suit represented a potential

31

liability of $42 million is not found in the Madison County complaint (*id.*; Ex. 21) and is not supported other than with reference to the Copperfield Report. (Compl. ¶ 65.) There are no facts pled for the contention that the suit incurred such potential liability or that investors were misled concerning the suit. "Mere speculation is insufficient to satisfy the PSLRA pleading standard." *Bond Opty Fund v. Unilab Corp.*, 87 Fed. Appx. 772, 773 (2d Cir. 2004).

Finally, in terms of the GAAP violations, Plaintiffs fail to plead these allegations with relevant specificity, *see supra* I.(c), and regardless, such allegations "or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also ECA and Local 134 IBEW Joint Pension Trust of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009) (same).[3]

---

[3] Plaintiffs' allegations of scienter based on the resignations of Borislow, MacInnes and Russo from the Company are not in the Complaint, *see Wright v. Ernst & Young, LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (a plaintiffs may not amend its complaint in motion papers), and in any event, resignations must be "highly unusual and suspicious" in order to support an inference of scienter. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011). In Plaintiffs' sole cited precedent, *Hall v. Childrens' Place Retail Stores, Inc.*, 580 F. supp. 2d 212, 233 (S.D.N.Y. 2008) the resignations included the company's public auditor and forced resignation of the CEO, facts not present here.

Thus, Plaintiffs have failed to allege facts sufficient to raise a strong inference that the Individual Defendants, or the Company itself, had the motive to commit or actual knowledge of any alleged fraud.

### D. *Plaintiffs Fail to Adequately Plead Loss Causation*

Plaintiffs maintain that the Complaint alleges precisely how each fraud-related disclosure is causally connected to a specific stock drop and provides "fair notice" to Defendants of the causal connection.

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiffs." *Emergent Capital,* 343 F.3d at 197. The PSLRA codified this judge-made requirement: "In any private action arising under this chapter, the plaintiffs shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiffs seek to recover damages." 15 U.S.C. § 78u-4(b)(4). The Supreme Court recently clarified the pleading requirements for loss causation in the context of alleged violations of Section 10(b). To properly plead loss causation, a plaintiff must provide "the defendants with notice of what the relevant economic loss might be [and] what the causal connection might be between the loss

and the [alleged] misrepresentation." *Dura Pharm.,* 544 U.S. at 347, 125 S. Ct. 1627.

In support of loss causation, Plaintiffs cite that the stock price dropped 6% in response to the stock pledge disclosures, 11% in response to the Copperfield Report, and almost 10% in response to the WSJ Article exposing risks inherent to the Company's put option scheme. (Compl. ¶¶ 5, 8, 103, 128.)

Both Borislow's stock pledge disclosure and the put option strategy discussed in the WSJ Article did not involve material misrepresentations, and thus cannot be the basis for loss causation. *See supra* I.(b). The same holds true for the information cited in the Copperfield Report. Regardless, Plaintiffs fail to allege with particularity any facts connecting the specific alleged misrepresentations to declines in stock value.

For instance, Plaintiffs assert that a statement in the March 15, 2012 Year-End 2011 10-K that there was "a higher percentage of magicJack units being sold to retailers and distributors at wholesale prices as opposed to direct sales to customers at retail prices" was false (Compl. ¶ 117) because on

the same page of the same 2011 10-K it states that "in 2011 and 2010, sales of the magicJack and magicJack plus units through retail outlets represented approximately 57% and 73% respectively." (Compl. ¶ 118.) A statement cannot be misleading where the corrective disclosure was made on the same page of a prospectus, and as such cannot be the basis for a decline in stock price. *See Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 763 (2d Cir. 1991). Plaintiffs also fail to cite any market reaction corresponding to the alleged corrective disclosure. Similarly, Plaintiffs assert that the Company "manipulated and understated the depreciation expense of certain assets" by "arbitrarily chang[ing] the estimated useful life of its switches and other ancillary equipment from 3 years to either 10 or 15 years," (Compl. ¶¶ 70, 72), but do not allege any facts supporting a market reaction corresponding to this disclosure. Plaintiffs also do not allege any specific market reaction attributable to the disclosure of the put position in the Q2 10-Q.

In any event, the Copperfield Report acknowledges that "all information contained [in the report] has been obtained from public sources." In cases where, as here, Defendants have not otherwise misrepresented the public facts upon which such a report is predicted, the report cannot establish loss causation.

35

*See, e.g., Teachers' Ret. Sys. V. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory . . . is that these facts had already been disclosed in public filings, so their [subsequent] revelation . . . could not have caused [the] stock price to decline."); *In re Comnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("negative . . . characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the [author's] opinions"); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ 975, 2012 WL 1646888, at *31 (S.D.N.Y. Mar. 4, 2013) ("[i]nvestors cannot establish loss causation merely by relying on after-the-fact negative characterization of already public information); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) ("The mere negative characterization of existing facts that were never hidden from investors does not permit [plaintiffs] to plead loss causation.").

Plaintiffs' cited precedent is not to the contrary. In *In re Winstar Communications*, No. 01 Civ. 3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006), the court found that fact reports based on publicly available information did not negate loss causation or materiality where the public information was "contrary to false statements made by the defendants" and "[t]he

36

reports also revealed [defendants'] questionable accounting practices, of which the public had not previously been made aware." *Id.* at *15. Similarly, in *Forgarazzo v. Lehman Bros, Inc.*, 341 F. Supp. 2d 274, 290 (S.D.N.Y. 2004), the court held that even where the "true facts were available for the world to see," the later reports of these facts were sufficient to show loss causation where the defendant issued inaccurate and misleading statements about the objective facts to "obscure the conclusion" that the defendant's company was failing.  In contrast, where, as here, a defendant has properly disclosed the public information later reported, and where no facts support allegations of material misstatements, investors cannot establish loss causation merely by relying on an after-the-fact "negative characterization of already-public information." *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 512 (2d Cir.2010).

Accordingly, loss causation is not sufficiently pled. *See Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d Cir. 2005).

## II. The Section 20(a) Claim is Dismissed

In order to plead a § 20(a) claim, "a complaint must allege (1) a primary violation of the [Exchange] Act by a

37

controlled person, (2) direct or indirect control by the defendant of the primary violator, and (3) 'culpable participation.'" *Janbay v. Canadian Solar Inc.,* 2012 WL 1080306, at *17 (S.D.N.Y. Mar. 28, 2013) (internal citations omitted); *see also* 15 U.S.C. § 78t(a).  As set forth above, Plaintiffs have failed to plead a primary violation of § 10(b) and § 10(b)-5, and Plaintiffs' § 20(a) claim is therefore dismissed. *See Janbay,* 2012 WL 1080306, at *17.

## Conclusion

For the reasons set forth above, Defendants' motion to dismiss is granted.

It is so ordered.

New York, NY
January 29 , 2014

_____
**ROBERT W. SWEET**
**U.S.D.J.**